**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 22-1757

_____

JOSEPH RIAD; RIAD HOLDINGS, INC.,

Appellants

v.

WELLS FARGO BANK, N.A.

_____

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D. C. No. 2-19-cv-04292)
District Judge:  Honorable Chad F. Kenney

_____

Submitted under Third Circuit L.A.R. 34.1(a)
on March 23, 2023

Before:  RESTREPO, PHIPPS and ROTH, Circuit Judges

(Opinion filed December 15, 2023)

_____

OPINION[*]

_____

---

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

ROTH, Circuit Judge

The District Court granted Wells Fargo Bank, N.A.'s, motion for summary judgment, dismissing the claims of Joseph Riad and Riad Holdings, Inc.[1] (collectively, Riad) because they were time barred. Riad argues that the District Court erred because equitable estoppel tolled the statutes of limitations. We are unpersuaded and will thus affirm.

I.

In 2019, Riad brought claims of negligence, negligent hiring and supervision, conversion, breach of contract, and unjust enrichment against Wells Fargo.[2] These claims were based on allegedly improper wire transfers, mishandled cashier's checks, and missing deposits. The following evidence was produced during discovery:

Riad held accounts with Wells Fargo. At the time, it was Wells Fargo's policy to mail monthly statements.[3] In January 2012, however, Riad sent the bank a letter, which complained that he could not "get a statement showing [him] the money in the account" and that the "ATM printouts [were] not showing [him his] balances."[4] Riad testified, however, that he would sometimes see his balance by "us[ing his] ATM card"[5] and that

---

[1] Joseph Riad is the chair of Riad Holdings, Inc., "a privately held family trust." JA91.
[2] Riad also brought claims that Wells Fargo violated the Pennsylvania Unfair Trade Practices and Consumer Protection Law (UTPCPL).
[3] Customers could opt for electronic statements, but Riad did not.
[4] JA259. While Riad addressed this letter to Wachovia Bank, no one disputes that Wells Fargo acquired Wachovia in 2008. Jonathan Stempel, *Wells Fargo completes Wachovia purchase*, Reuters (Jan. 1, 2009, 8:16 AM), https://www.reuters.com/article/wellsfargo-wachovia/wells-fargo-completes-wachovia-purchase-idINN0133136720090101/.
[5] JA441–42 ("I did some purchases with the debit card, and it would print out the statement as to how much I had.").

he recalls getting "one or two bank statements."[6] He would physically go to a Wells Fargo branch "at least twice a week" to see his balance.[7] Outside of Riad's testimony, the record has no evidence of what was displayed during these visits.

A Wells Fargo representative testified that "Wells Fargo has been unable to locate any communications from either Riad or [his former spouse] reflecting that statements were not received."[8] Riad's former spouse testified that the statements from their shared account "would have been sent to the home that [he] owns and sometimes lived" in.[9] Riad recalled seeing contact information for customer support at the bottom of a mailed bank statement.

Riad testified that Wells Fargo sent six unauthorized wire transfers between November 23, 2010, and January 18, 2011, which totaled over $1 million. Riad said he discovered these transfers "on the screen" of Triandos Randolph, a Wells Fargo branch manager.[10] Randolph, according to Riad, confirmed that these transfers were a mistake and that the problem would be resolved quickly.[11] On January 28th, Riad wrote a letter to the bank, explaining that Randolph told him that an employee mistakenly sent the wire transfers while Riad was travelling, that he had "demanded reverse wires," that he had "been promised that this problem w[ould] be resolved quickly," and that Wells Fargo had

---

[6] JA619.
[7] JA90, 441.
[8] JA221.
[9] JA328.
[10] JA90.
[11] JA440.

not yet resolved the problem.[12]  Riad testified that, at various points over the next five years, he followed up with Randolph who "promis[ed] continuously that this was going to get resolved."[13]  After three years of no action, Riad spoke with the new manager at the bank, Ryan Silhan, who "revert[ed him] back to [Randolph]" because Silhan did not "know anything about it."[14]  Riad again contacted Randolph about his concerns.[15]

Riad testified that Wells Fargo improperly deposited cashier's checks between December 2011 and January 2012, resulting in a roughly $1.1 million loss.[16]  He said that he orally complained once to Silhan.  He confirmed that he neither complained in writing to Wells Fargo nor followed up again with Silhan.  Riad also testified that Wells Fargo did not credit his accounts with two deposits from November 2010 and January 2012, respectively about $2.5 million and $1.1 million.[17]

---

[12] JA90, 160.

[13] JA438.  Three of Riad's friends submitted affidavits, testifying that they overheard Randolph make these promises.

[14] JA438.

[15] JA438.

[16] Riad's expert witness analyzed the accounts and transactions related to these cashier's checks.  Riad originally alleged that he was missing over $4.4 million, but "he learned in discovery that the missing amount on those transactions was limited to $1,100,000." Appellant Br. at 17 n.4.  Riad testified that it was "possible" that he deposited the purportedly missing $1.1 million into his PNC account.  JA138.

[17] There is limited, to no, evidence that Riad made either deposit.  Regarding the November 2010 deposit, Riad presents a "cash in debt teller" receipt, which appears to show that Teller 0092 had customers deposit a total of $2,500,688.  *See* JA305.  After reviewing this receipt, Riad's expert concedes that this is the likely interpretation of this receipt.  In other words, this is not evidence that Riad deposited this amount of money.  As to the January 2012 deposit, Riad points to a handwritten "Transaction Record" showing that $1,100,000 was deposited into an account number "169."  JA307.  This does not appear to be Riad's, however, because he did not have an account beginning or ending with 169 until the next year.

He explained that he did not learn about these errors or the improperly deposited cashier's checks until sometime between May and December 2015, when Wells Fargo closed his accounts and sent him a check for what he purportedly had in the bank. Riad explained that, because he had previously seen a balance of over $6 million "on the screen," he was expecting to receive a check of that size.[18]  Instead, he received "a check to the tune of 50-some-odd thousand dollars."[19]

After discovery, Wells Fargo moved for summary judgment, arguing that Riad's claims are time barred. The District Court agreed.[20] Riad appealed.

II.[21]

Because the statutes of limitations for Riad's claims are two and four years, Riad's claims are time barred unless an exception applies.[22] Riad contends that he can invoke two exceptions: first, that the statute of limitations for the claims related to the wire transfers are equitably tolled because of Wells Fargo's fraudulent concealment; second, the discovery rule tolled the limitations period for the claims related to the cashier's

---

[18] JA436–37.

[19] JA437.

[20] The District Court did, however, deny summary judgment as to Riad's UTPCPL claims. The parties have since settled this claim.

[21] The District Court had subject matter jurisdiction under 28 U.S.C. § 1332. We have jurisdiction under 28 U.S.C. § 1291. We review plenary a district court's summary judgment decision. *Ellis v. Westinghouse Elec. Co., LLC*, 11 F.4th 221, 229 (3d Cir. 2021).

[22] A two-year statute of limitations governs the tort claims—negligence, negligent hiring, and conversion. 42 Pa. C.S.A. § 5524(2)–(3). A four-year statute of limitations governs the contract claims—breach of contract and unjust enrichment. *Id.* § 5525(4), (8). Riad does not dispute that the alleged injuries occurred between 2010 and 2012, at least seven years before he filed his complaint. *See* Appellant Br. at 10, 17, 27.

5

checks and deposits. We conclude that these exceptions do not apply and will thus affirm the judgment of the District Court.

The Pennsylvania Supreme Court uses "[e]quitable tolling" as an "umbrella" concept under which both fraudulent concealment and the discovery rule fall.[23] Fraudulent concealment and the discovery rule are often discussed together because "the circumstances cited to justify the failure to file suit at an earlier time can implicate both doctrines."[24] Under both doctrines, estoppel cannot result if the plaintiff did not use "reasonable diligence to investigate [his] claims."[25] Reasonable diligence is not shown unless a plaintiff can demonstrate that he "exhibited 'those qualities of attention, knowledge, intelligence and judgment which society requires of its members for the protection of their own interests and the interests of others.'"[26] Although typically a question for the jury, this Court may determine as a matter of law that a statute is not equitably tolled if "reasonable minds would not differ" in finding a plaintiff did not act with reasonable diligence.[27]

---

[23] *Rice v. Diocese of Altoona-Johnstown*, 255 A.3d 237, 248 n.3 (Pa. 2021) (quoting *Nicole B. v. Sch. Dist. of Phila.*, 237 A.3d 986, 995 (Pa. 2020)).

[24] *Id.* Fraudulent concealment is when a defendant causes a plaintiff "to relax his vigilance or deviate from his right of inquiry." *Id.* at 248 (quotation marks omitted) (quoting *Molineux v. Reed*, 532 A.2d 792, 794 (Pa. 1987)). Although a fact finder must decide the weight of evidence, "[w]hether an estoppel results from established facts" is a legal question for the court. *Fine v. Checcio*, 870 A.2d 850, 860 (Pa. 2005) (citing *Nesbitt v. Erie Coach Co.*, 204 A.2d 473, 476 (Pa. 1964)). Under the discovery rule, a statute of limitations is tolled until it is reasonable for a plaintiff to know of their injury or its cause. *Rice*, 255 A.3d at 247.

[25] *Rice*, 255 A.3d at 249, 253.

[26] *Wilson v. El-Daief*, 964 A.2d 354, 363 n.6 (Pa. 2009) (quoting *Cochran v. GAF Corp.*, 666 A.2d 245, 249 (Pa. 1995)).

[27] *Fine*, 870 A.2d at 858.

Here, reasonable minds would agree that Riad did not exercise reasonable diligence in investigating his injuries related to (1) the wire transfers, or (2) the cashier's checks and deposits.

### 1. Wire Transfers

Riad contends that, because of Wells Fargo's fraudulent concealment, the statute of limitations for the claims related to the wire transfers is equitably tolled.[28] Riad argues that he was estopped from pursuing litigation because Wells Fargo "made promises until 2016 that it was continuing its efforts to reverse the wires, asked him to be patient with the process, and assured him that it would credit the wired amounts upon conclusion of the reverse-wire process."[29] Riad's argument that Wells Fargo's actions caused him to delay this litigation might indeed hold some water,[30] but reasonable minds would not differ in finding that he did not act with reasonable diligence.

Riad does not contest that he learned in January 2011 that over $1 million was purportedly transferred from his account.[31] Riad's actions to recover this large sum of money were limited. Riad did write a letter to Wells Fargo the same month that he learned about the six unauthorized wire transfers. This letter is the only time until he filed his complaint (eight years later), however, that Riad put any concerns related to

---

[28] Appellant Br. at 40.
[29] Appellant Br. at 40.
[30] *See* JA438–40 (Riad's testimony regarding Randolph's purported promises); JA529, 537, 541 (affidavits of three of Riad's friends testifying that they heard Randolph make these promises).
[31] Appellant Br. at 10.

these wire transfers in writing. According to Riad's 2011 letter, the bank manager Randolph "promised [him] that this problem would be resolved quickly."[32]

After realizing that this purported promise was not kept (i.e., the problem was not resolved, let alone resolved quickly), Riad admitted that he spent years merely following up orally with Randolph from time to time. He did not put any of these contacts in writing. He did not keep a log of these contacts. He did not attempt to get in touch with Randolph's superior. No reasonable juror could conclude that these passive efforts in trying to reclaim over $1 million constitute reasonable diligence.

Because no reasonable juror could conclude from the record that Riad acted with appropriate diligence under the circumstances, Riad's fraudulent concealment argument fails. We will thus affirm the District Court's grant of summary judgment as to the wire fraud claims.

### 2. Cashier's Checks and Deposits

Riad also contends that the discovery rule tolled the limitations period for the claims related to Wells Fargo's mishandling of nearly $5 million in cashier's checks and deposits between December 2011 until January 2012. He urges us to find that from 2012 to 2015 he had no way of knowing that over $5 million was purportedly missing from his accounts. His argument is unpersuasive as to all relevant claims; reasonable minds would

---

[32] JA160.

not find that Riad acted diligently in discovering this allegedly missing large sum of money.[33]  The record makes clear that Riad was willfully ignorant to his account balance.

Riad had at least two ways to view his bank statements other than Randolph's screen.  First, Riad could have viewed his account balance from a mailed monthly statement.  At the time it was standard practice for Wells Fargo to mail monthly statements.  Riad noted in a letter in 2012 that he could not get a statement showing his balance.  However, Riad testified that he remembers receiving at least a few statements.[34]  Even though Riad knew how to contact Wells Fargo about any concerns,[35] there is no evidence of Riad or his former spouse contacting Wells Fargo to say they were not receiving statements.  Accordingly, the evidence suggests that Riad received at least a few statements, if not more, from which he could have discovered his account balances prior to receiving the 2015 check.

Second, Riad could have used his ATM card to check his balances.  Again, even though he noted in 2012 that he was having trouble seeing his balances on his ATM card, Riad testified that he could see his balances in this way.  Thus, Riad had access, at least some of the time, to view his balances via his ATM card prior to 2015.

Rather than review his balances on a mailed statement or an ATM receipt, he relied on the balances displayed on Randolph's screen.  Only able to explain that he saw

---

[33] Even if we were to agree that these claims were tolled until 2015, Riad's torts claims would still be time barred because the statutes of limitations for these claims is only two years.  42 Pa. C.S.A. § 5524(2)–(3).

[34] JA619.

[35] This is evidenced by Riad's January 2011 letter and his testimony that he recalled seeing language with the contact information for customer support.

9

a figure of over $6 million on the screen, Riad cannot recall an exact figure and offered no printed statements from these visits to show the figure that he purports to have seen. Riad maintained little-to-no records despite thinking that more than $1 million had been improperly wired from his accounts and had not yet been returned.

There is no evidence that Riad took any steps to confirm that the alleged millions of dollars from the cashier's checks and deposits were properly credited to his accounts. Accordingly, a reasonable jury could not find that Riad acted with reasonable diligence in monitoring his account. We thus conclude that Riad's discovery rule argument also fails and will affirm the District Court's grant of summary judgment as to the claims related to the cashier's checks and deposits.

### III.

For these reasons, we will affirm the District Court's grant of summary judgment.